**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

_____

|  |  |  |
|---|---|---|
| PAUL A. PORTU | ) | |
| 8311 Frosty Court | ) | |
| Lorton, Virginia  22079 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| LINDSAY VIRGINIA MOTORS, LLC d/b/a | ) | C.A. No. _____ |
| LINDSAY VOLVO OF ALEXANDRIA and | ) | |
| LINDSAY VOLVO CARS OF ALEXANDRIA | ) | |
| 3410 King Street | ) | |
| Alexandria, Virginia  22302 | ) | |
| | ) | |
| Serve:  Michael Lindsay | ) | |
| 3410 King Street | ) | |
| Alexandria, Virginia  22302 | ) | |
| Registered Agent | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LINDSAY MANAGEMENT COMPANY, LLC | ) | |
| 1525 Kenwood Avenue | ) | |
| Alexandria, Virginia  22302 | ) | |
| | ) | |
| Serve:  Michael G. Charapp, Esq. | ) | |
| 8180 Greensboro Drive, Suite 1000 | ) | |
| McLean, Virginia  22102 | ) | |
| Registered Agent | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LINDSAY MOTOR CAR CO. | ) | |
| d/b/a LINDSAY AUTOMOTIVE GROUP | ) | |
| 1525 Kenwood Avenue | ) | |
| Alexandria, Virginia  22302 | ) | |
| | ) | |
| Serve:  David A. Hirsch, Esq. | ) | |
| 11860 Sunrise Valley Drive, Suite 100 | ) | |
| Reston, Virginia  20191 | ) | |
| Registered Agent | ) | |

|                                              |     |
|----------------------------------------------|-----|
| and                                          | )   |
|                                              | )   |
|                                              | )   |
| DANIEL KREPS                                 | )   |
| 1521 Boyd Pointe Way, Apt. 2304              | )   |
| Vienna, Virginia 22182                       | )   |
|                                              | )   |
| Defendants.                                  | )   |
| _____         | )   |

## COMPLAINT

COMES NOW THE PLAINTIFF, PAUL A. PORTU, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendants, LINDSAY VIRGINIA MOTORS, LLC d/b/a LINDSAY VOLVO OF ALEXANDRIA and LINDSAY VOLVO CARS OF ALEXANDRIA; LINDSAY MANAGEMENT COMPANY, LLC; LINDSAY MOTOR CAR CO. d/b/a LINDSAY AUTOMOTIVE GROUP; and DANIEL KREPS, jointly and severally, and in support of such motion alleges and avers as follows:

## NATURE OF ACTION

1.      This is a civil action against the Defendants, Lindsay Virginia Motors, LLC d/b/a Lindsay Volvo of Alexandria and Lindsay Volvo Cars of Alexandria, Lindsay Management Company, LLC, Lindsay Motor Car Co. d/b/a Lindsay Automotive Group, and Daniel Kreps, alleging interference with the exercise of rights granted under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and retaliation in violation of the FMLA when Plaintiff was terminated after exercising his FMLA rights.

## PARTIES

2.      Plaintiff Paul A. Portu ("Mr. Portu") is a resident and citizen of Lorton (Fairfax County) in Commonwealth of Virginia.  At all times relevant hereto, Mr. Portu was employed at the Lindsay automotive dealership located at 1605 Fern Street in the City of Alexandria.

3.      Lindsay Virginia Motors, LLC d/b/a Lindsay Volvo of Alexandria and Lindsay Volvo Cars of Alexandria is a domestic corporation in good standing, headquartered in the City of Alexandria, and which owns and operates an automotive dealership in the City of Alexandria. in this judicial district.

4.      Lindsay Management Company, LLC is a domestic corporation in good standing, with its principal office address located in Alexandria, Virginia, in this judicial district.  Lindsay Management Company, LLC shares its principal office address with Lindsay Motor Car Co.

5.      Lindsay Motor Car Co. d/b/a Lindsay Automotive Group is a Delaware corporation, registered to do business and in good standing in the Commonwealth of Virginia, and maintaining an agent for the service of process in the Commonwealth of Virginia.  Lindsay Motor Car Co. d/b/a Lindsay Automotive Group is headquartered  in Alexandria, Virginia and has locations throughout the DC-Maryland-Virginia area.

6.      Defendants Lindsay Virginia Motors, LLC d/b/a Lindsay Volvo of Alexandria, Lindsay Volvo Cars of Alexandria, Lindsay Management Company, LLC, and Lindsay Motor Car Co. d/b/a Lindsay Automotive Group are collectively referred to herein as "Lindsay Volvo."

7.      Mr. Portu was an "eligible employee" of Lindsay Volvo within the meaning of 29 U.S.C. §2611(2)(A).

8.      Lindsay Volvo is an "employer" within the meaning of 29 U.S.C. §2611(4)(A).

9.      Lindsay Volvo is engaged in an industry affecting commerce and has had more than 50 employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 29 U.S.C. § 2611 (4) (A).

10.      Daniel ("Danny") Kreps ("Mr. Kreps") is a resident and citizen of Vienna, Virginia (Fairfax County) in the Commonwealth of Virginia, in this judicial district.

11.     At all times relevant hereto, Mr. Kreps was, and is, the General Manager of Lindsay Volvo.  At all times relevant hereto, Mr. Kreps had supervisory authority over Mr. Portu. Mr. Kreps is an "employer" within the meaning of 29 U.S.C. §2611(4)(A)(ii)(I).

## JURISDICTION

12.     This Court has jurisdiction over Plaintiff's claims pursuant to the 29 U.S.C. § 2617 (the Family and Medical Leave Act).

13.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

14.     Lindsay Volvo is present in and regularly conducts business in this judicial district, and Mr. Kreps, as a managerial and supervisory employee of Lindsay Volvo, regularly conducts business on behalf of Lindsay Volvo in this judicial district.

15.     The causes of action alleged in this action arose or originated within the Eastern District of Virginia.

## VENUE

16.     Lindsay Volvo is present in and regularly conducts affairs and business activities in this judicial district.

17.     The causes of action alleged in this action arose or originated in this judicial district.

18.     The unlawful employment practices committed by Defendants occurred in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, Mr. Portu was employed in this judicial district, Lindsay Volvo is located in this judicial district, and Mr. Portu would still be employed in this judicial district but for the unlawful practices of the Lindsay Volvo and Mr. Kreps.

19.     Venue over Plaintiff's claims is proper in this Court pursuant to 28 U.S.C. § 1331.

## BACKGROUND

20.     Mr. Portu began his career in automotive service management on June 1, 1979 when he became employed as a Service Manager at Croyste Toyota.  Mr. Portu remained in this position for 10 years, at which time he left for an opportunity at Springfield Toyota for additional compensation.  Mr. Portu remained with Springfield Toyota, for 10 years, until 1999, when he was hired by Don Beyer as Service Manager for Volvo, Subaru, and Kia.

21.     In August 2017, Mr. Portu was approached by Bill Conner ("Mr. Conner") to accept the Service Manager position at the new Lindsay Volvo dealership.  Lindsay Automotive Group had just purchased the Volvo franchise from Don Beyer.  Mr. Conner noted that Mr. Portu's Volvo experience, expertise, and relationship with the employees were paramount to the job offer, and Lindsay Volvo capitalized on Mr. Portu's long term relationship with the potential employees coming from Beyer to secure them as Lindsay Volvo employees.

22.     On October 13, 2017, Mr. Portu signed a Dealership Compensation Plan as the Service Manager for the Lindsay Volvo Cars of Alexandria dealership.  No further job description was provided.

23.     On October 17, 2017, the new Lindsay Volvo franchise opened.  Mr. Portu was chosen to manage the Volvo Service Department because of his past record of managing Volvo for Beyer Automotive for 15 years.  Mr. Portu's immediate supervisor at the time of his hire was Bill Conner, the Service Director of Lexus, who oversaw the Lindsay service operations of Lexus, Cadillac, and now, the brand new Volvo franchise.

24.     As a supervisory employee, Mr. Portu was told by his own supervisor, Mr. Conner, on multiple occasions, that company HR policy required three Disciplinary Write-Ups

before an employee could be dismissed.  During Mr. Portu's tenure with Lindsay Volvo, he strictly adhered to that policy, which protected both the dealership and the employee, and only dismissed employees once they had been written up three times.

25.     During his tenure with Lindsay Volvo, Mr. Portu was never written up for any performance shortcomings or disciplinary issues at any time, and he received positive performance reviews, exceeding the objectives set for him in terms of service department revenue, profit growth and customer satisfaction index ratings.

26.     On or about July 1, 2018, Mr. Portu received a compensation increase from 2% of service department gross profit to 3% of gross profit, and a Customer Satisfaction Index (CSI) pay component increase from $ 1,500 per month to $ 2,500 per month as a reward for his excellent performance.

27.     Through his tenure, Mr. Portu received many positive verbal comments from John Smallwood, COO of Lindsay Automotive Group, thanking him for his professional management and financial achievements.  Mr. Smallwood referred to Lindsay Volvo as "his baby," and was always very pleased and excited about the accomplishments at Lindsay Volvo and the Volvo service department.

28.     Mr. Portu also received multiple positive comments from Bert Brenner, CFO of Lindsay Automotive Group, regarding his financial performance and management expertise.

29.     During Mr. Portu's 26 month tenure at Lindsay Volvo, he earned the Customer Satisfaction Component of his compensation 25 of the 26 months, indicating a 96.2 % Customer Satisfaction Performance index achievement on his pay plan.

30.     In the summer of 2019, Mr. Portu was diagnosed with Recurrent Prostate Cancer. His initial cancer diagnosis and treatment was in 2011, prior to his employment with Lindsay Volvo.

31.     On August 19, 2019, Mr. Portu began a six month process of Lupron injections to treat his cancer.  The side effects of nausea, diarrhea and intense hot flashes were a daily hardship, and at times, very embarrassing.  Nevertheless, Mr. Portu continued working and fulfilling his daily job responsibilities, managing the Service Department, and surpassing the stated objectives of management.

32.     On October 24, 2019, Mr. Portu started radiation treatment.  His course of treatment was for 38 sessions of radiation, scheduled for five days each week.  Mr. Portu requested to schedule his radiation appointments for 2:45 p.m. each day, which was the latest radiation appointment available so it would provide the least amount of disruption to his workday as possible and allow him to continue to manage the service department to maintain its high levels of performance.  Mr. Conner was understanding and told Mr. Portu, "Just do your best, I'm sure all will be fine."

33.     During the time Mr. Portu was undergoing his cancer treatment, productivity in the Service Department actually increased.

34.     On October 30, 2019, Mr. Kreps requested that Mr. Portu change his radiation appointment time to later in the day.  When Mr. Portu explained that 2:45 p.m. was the latest available appointment slot, Mr. Kreps expressed his displeasure.

35.     On November 16, 2019 Mr. Kreps requested that Mr. Portu assure and confirm to him that Mr. Portu would continue to work through the end of the year.  Mr. Portu replied that as

long as he was physically able, he would be working through the end of the year, and he promised his 100% effort to meet the request.

36.     At the time Mr. Kreps made the request, he was aware, and could observe, that Mr. Portu was suffering from extreme fatigue as a result of the radiation treatments. His request was insensitive, inappropriate, heartless and not considerate of a person fighting for his life, but Mr. Kreps was only thinking of himself, and how any decline in service as a result of Mr. Portu's absence would reflect on him.

37.     By November 13, 2019, the effects of Lupron and radiation, particularly the fatigue, were overwhelming, and Mr. Portu was forced to alter his work schedule – leaving at 2:00 p.m. each day for his radiation appointment, and then going home to sleep late into the night, so that he could muster the strength to return to work the next morning, before leaving again for radiation.  He continued this schedule until the start of his FMLA leave on January 6, 2020.  This wreaked havoc with any sense of a regular schedule, which exacerbated Mr. Portu's symptoms, and his ability to regain strength each day was severely compromised .

38.     As Mr. Portu's strength and stamina continued to decline, and the debilitating side effects of the radiation increased, Mr. Portu continued to honor his commitment to work until the end of the year.

39.     During the entire duration of Mr. Portu's cancer therapy, under his management, his department met and exceeded its financial and program goals and objectives.

40.     On December 2, 2019, during a general conversation with Mr. Kreps, Mr. Kreps stated that Lindsay Management was willing to operate Lindsay Volvo "in the red" (*i.e.,* not profitable) for the first 24 months.

41.     During the same conversation, Mr. Kreps stated that Lindsay Volvo made $1,000,000 net profit in its second full year in operation (2019).  This was a phenomenal accomplishment, and Mr. Portu was proud that the superlative performance of the Service Department was a major contributor to net profit.

42.     On or about December 13, 2019, Mr. Conner (Mr. Portu's direct supervisor) resigned from Lindsay Automotive.  He was replaced by Paul Girardi ("Mr. Girardi").

43.     On or about December 19, 2019, Mr. Portu was advised that Mr. Girardi would assume Mr. Conner's supervisory responsibilities over Lindsay Lexus, Cadillac and Volvo.

44.     On December 20, 2019, Mr. Portu submitted his FMLA leave request to Mr. Kreps (Volvo General Manager) and the Lindsay Automotive HR Department.

45.     Mr. Portu began his eight week FMLA leave on Monday, January 6, 2020.

46.     On or about January 10, 2020, Mr. Smallwood, COO of Lindsay Automotive, via email, implored Mr. Portu to "please come back."  Mr. Portu replied and assured Mr. Smallwood he intended to return to his position at the conclusion of his eight week FMLA leave.

47.     On January 13, 2020, while Mr. Portu was on FMLA leave, Ravinder Singh ("Mr. Singh"), Team Leader at Lindsay Automotive Group, requested Mr. Portu's assistance with payroll.  Mr. Portu provided assistance by telephone.

48.     On February 3, 2020, while Mr. Portu was on FMLA leave, Mr. Singh requested that Mr. Portu come to work to finalize the January financials, and complete payroll and bonus statements for several employees, since no one else knew how to complete these financial documents.  Despite his then-current medical condition, Mr. Portu went to work and completed these tasks, since it was important to him that employees under his supervision received their proper compensation in a timely manner.

49.      On or about February 19, 2020, Mr. Portu and his wife encountered Bert Brenner, CFO of Lindsay Automotive, at Home Depot.  During their conversation, Mr. Brenner stated that he was excited for Mr. Portu to return to work.  Mr. Portu replied that he was equally excited and looking forward to returning to his job, expressed that his recovery was going well, and that he was on schedule to return after his eight week FMLA leave was over, as stated in his FMLA leave request letter.

50.      On Friday, February 28, 2020, in an effort to stay a step ahead of HR and to facilitate his timely return to work, Mr. Portu provided his Return to Work Letter to Mr. Kreps. The Return to Work letter was provided by the Inova Alexandria Cancer Center and signed by Mr. Portu's Oncologist, Tobias Chapman, M.D.

51.      Upon receiving the letter, Mr. Kreps immediately declared it insufficient since it did not include the phrase "no restrictions" or "without limitations."

52.      During this conversation, Mr. Kreps stated that Mr. Portu had taken off too much time in 2019 (as a result of his cancer treatment) and that as a result, the Service Department was "underperforming."  This statement was demonstrably false, and when Mr. Portu asked for proof and details to support the allegation, which he knew to be false, that his department was "underperforming," Mr. Kreps refused (or was unable) to provide any.

53.      Mr. Kreps also stated that he had enjoyed saving money by not having to pay Mr. Portu during his FMLA leave.  This comment served no purpose other than to demonstrate Mr. Kreps' open hostility towards Mr. Portu for taking FMLA leave.

54.      While under Mr. Portu's supervision, the Service Department had never been characterized as "underperforming," and, in fact, the department exceeded the objectives set by management.  In addition, even if this were not the case, Mr. Kreps himself had acknowledged

that Lindsay Automotive was prepared to allow up to 24 months for the Lindsay Volvo dealership to become profitable.  Notably, the Volvo Service Department, under the supervision of Mr. Portu, operated in advance of the objectives set by management.

55.     Prior to taking FMLA leave, Mr. Portu had never been written up for any performance deficiencies, and his department consistently operated in advance of objectives set by management.

56.     During this same conversation, Mr. Kreps offered Mr. Portu the position of Sales Manager and/or Service Advisor.  Mr. Portu found this offer strange, and declined, stating his intent to return to the position he had held eight weeks prior when he went out on leave – Service Manager.

57.     Mr. Kreps' attitude and hostile treatment towards Mr. Portu, which started prior to Mr. Portu going out on FMLA leave as he was attempting to work through the debilitating side effects of his cancer treatment and taking time off for radiation treatments, continued, and escalated, after Mr. Portu exercised his right to take FMLA leave, as Mr. Portu prepared for his return to work, and then returned to the workplace.

58.     Mr. Portu emailed his physician over the weekend, and worked with the Oncology department at Alexandria Hospital, to secure a revised Return to Work letter to meet Mr. Kreps' standards.

59.     Mr. Portu's first day back at work after FMLA leave was March 2, 2020.  Mr. Portu was excited to be back, and was greeted warmly by his employees.

60.     Later that day, Mr. Portu learned that Mr. Kreps had not provided the original Return to Work letter to HR.  Mr. Kreps refused to forward any Return to Work letter that did not include the phrase "no restrictions, no limitations."  Mr. Portu received the revised Return to

Work letter late in the afternoon on Monday, March 2, and immediately forwarded it to Mr. Kreps, and to HR

61.     Approximately 30 minutes after HR acknowledged receipt of the Return to Work letter, Mr. Kreps came to Mr. Portu's office and pressed him to sign a new compensation plan. The new plan, although similar in structure to Mr. Portu's original (October 13, 2017) compensation plan, was for reduced compensation, and included a Job Description dated 2012. Mr. Portu had never seen this job description, which included many new responsibilities (for reduced compensation).

62.     Mr. Portu told Mr. Kreps that the compensation plan he was now being asked to sign, immediately upon his return from FMLA leave, was not his current pay plan.  Mr. Kreps noted on the document that the plan was "in dispute," rather than just simply confirming Mr. Portu's compensation details with HR.  Mr. Portu did not sign the new compensation plan or the 2012 Job Description, which he had never seen before, and was not the same job he had been doing since the time of his hire, or when he went out on FMLA leave.

63.     The new compensation plan also indicated that Mr. Portu's new supervisor would be Sargio Desdunes, not Paul Girardi.  At no time prior to the presentation of this new plan was the change in supervision ever discussed.

64.     Mr. Kreps was aware, through previous encounters with Mr. Desdunes, that Mr. Portu and Mr. Desdunes did not have the best working relationship, and he knew that Mr. Portu would not want to be in Mr. Desdunes' reporting line.  Mr. Kreps intentionally made this change in retaliation for Mr. Portu taking FMLA leave, hoping to cause Mr. Portu to resign his employment.  Mr. Kreps stated and confirmed that the change in supervisor was his decision.

65.     Just before he left for the day, around 6:00 p.m., Mr. Kreps returned to Mr.

Portu's office with a corrected compensation plan (one that matched the compensation plan Mr.

Portu had prior to his FMLA leave), together with the 2012 Job Description.  Mr. Kreps again

attempted to pressure Mr. Portu to sign the documents, and again, Mr. Portu declined, taking the

compensation plan and job description home with him so he could review that evening.

66.     That same evening, as a professional gesture, Mr. Portu emailed Mr. Desdunes,

indicating his cooperation with the change in supervision and his commitment to the

department's continued success.  By sending this email, Mr. Portu made clear his intent to

continue in his employment under the supervision of Mr. Desdunes, and not resign as Mr. Kreps

had hoped.

67.     After a thorough review the job description that evening, combined with his

recent communications with Mr. Kreps, Mr. Kreps' hostile attitude toward him both before his

FMLA leave when he was continuing to work through the effects of medication and radiation,

and after his return from FMLA leave, Mr. Portu concluded that he was being pressured to sign

the job description, which included additional responsibilities not currently under Mr. Portu's

purview, so it could then be used against him as a tool for harassment and retaliation, and as the

basis for multiple write ups to create a paper trail to justify (albeit for false reasons) his

termination.

68.     On March 3, 2020, when Mr. Kreps arrived at work, he offered a stern "good

morning," and stated that he would "not repeat the previous evening's resistance," referring to

Mr. Portu's refusal to sign the compensation plan and 2012 job description that Mr. Kreps was

pressuring him to sign.  Mr. Portu returned the morning greeting and agreed that he did not want

a repeat either, but again stated, when Mr. Kreps indicated he was going to get the paperwork, that he would not sign it.

69.     Mr. Kreps was shaking with anger and told Mr. Portu that if he did not sign the paperwork, he would be terminated.

70.     Mr. Kreps left and later returned with a dismissal form.  Mr. Portu explained that the reason he refused to sign the documents was that he was afraid it would somehow waive his FMLA rights, since he was entitled to return to the same job at the same pay, and the documents he was being pressured to sign were for a different job than the one for which he was hired, and which he had been performing at the time he took FMLA leave.

71.     Mr. Kreps said he did not care.  Left with no choice, Mr. Portu signed the dismissal form and noted "this is not correct" on the form.  Mr. Kreps became angry and stated that he wrote the comments himself, and insisted they were correct.

72.     In terminating Mr. Portu in this manner, Lindsay Volvo did not follow its own policy regarding employee terminations.  Prior to his termination, Mr. Portu had not received three write-ups (or any), and prior to taking FMLA leave, he had never been counseled or disciplined for any performance related issue – either personally, or for his department.

73.     Mr. Desdunes was the only witness to Mr. Portu's termination. After signing the dismissal form, Mr. Portu was escorted off the premises by Mr. Kreps, which was meant to, and did, demean and humiliate Mr. Portu in the eyes of his colleagues, co-workers and direct reports, who observed Mr. Portu being escorted away.

74.     Mr. Portu, who had enjoyed a 40+ year career in the automotive service industry, had fully intended to remain with Lindsay Volvo until his retirement.

75.     Since that time, Mr. Portu has learned that on or about April 8, 2020, three other employees were presented with new pay plans, and all three employees refused to sign the new paperwork.  Unlike Mr. Portu, these three employees were not terminated, and remain employed by Lindsay Volvo.

**COUNT ONE –
INTERFERENCE WITH RIGHTS GRANTED
BY THE FAMILY AND MEDICAL LEAVE ACT**
(against all Defendants)

76.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

77.     Lindsay Volvo and Mr. Kreps interfered with Mr. Portu's rights to take leave under the FMLA by pressuring him, and extracting a promise from him, that he would continue to work through the end of the year prior to taking FMLA leave, despite the toll it was taking on his health.

78.     At the time Mr. Kreps asked Mr. Portu to commit to working through the end of the year prior to taking FMLA leave, Mr. Kreps was aware, and could observe, that Mr. Portu was suffering from extreme fatigue as a result of the radiation treatments.  Lindsay Volvo and Mr. Kreps knew, or should have known by their observations, that Mr. Portu's health was suffering as he struggled to remain on the job through the end of the year as requested, leaving at 2:00 p.m. each day for his radiation appointment, and then going home to sleep late into the night, so that he could muster the strength to return to work the next morning, before leaving again for radiation.  This schedule wreaked havoc with any sense of a regular schedule, which exacerbated Mr. Portu's symptoms, and his ability to regain strength each day was severely compromised.

79.     Lindsay Volvo and Mr. Kreps further interfered with Mr. Portu's rights to take leave under the FMLA by attempting to pressure him to sign a revised compensation plan and a job description from 2012 which he had never seen before (and which was not his job description prior to taking FMLA leave, and which included duties and responsibilities he had not been performing prior to his FMLA leave), and then, when he objected to the reduced compensation and new job description, attempted to force him to sign another compensation plan (without reduced compensation), but still coupled with a new, outdated, and different job description.

80.     When Mr. Portu refused to sign the documents, and even after he explained that his refusal to sign was based on his legally protected right to return to the same job he had at the time he left on FMLA leave, Mr. Kreps said that he "didn't care" and terminated Mr. Portu's employment.

81.     Mr. Portu was terminated the day after he returned to work, without having received any write-ups (much less, the three required write-ups required prior to termination), which was Lindsay Volvo's normal practice and procedure, and without ever having been counseled or otherwise reprimanded for any alleged performance deficiencies.

82.     The only time Mr. Portu received verbal notice of anything having to do with performance was when Mr. Kreps falsely stated, while Mr. Portu was on leave, that the department was underperforming.  This allegation was demonstrably and objectively false, and Mr. Kreps was unable to provide any details to substantiate this false statement.

83.     Defendants knew, or should have known, that Mr. Portu kept fully abreast of his job duties while on medical leave as he was asked on at least two occasions while he was on FMLA leave to perform tasks for Lindsay Volvo, one of which required his physical presence in

the workplace.  In addition, Mr. Portu kept Lindsay Volvo apprised of his intent to return to work as soon as his eight week FMLA leave was up, which he did.

84.     Mr. Kreps made clear his displeasure that Mr. Portu was taking medical leave in order to undergo treatment for his cancer, even during the time Mr. Portu remained on the job. Mr. Portu scheduled his radiation treatments for the last available appointment time in order to cause as little disruption to his workday as possible, but Mr. Kreps was still hostile towards Mr. Portu for taking time off, and he extracted a promise from Mr. Portu that he would remain on the job until the end of the year, despite the debilitating effects of his cancer treatment.  Mr. Kreps knew the department performed well and exceeded its goals under Mr. Portu's supervision, and Mr. Kreps was afraid that any decline in service or profits in Mr. Portu's absence would reflect poorly on him.

85.     Mr. Portu provided his Return to Work letter to Mr. Kreps on February 28, 2019, three days prior to his anticipated return to work, but Mr. Kreps deemed the letter insufficient and did not provide it to HR.

86.     Lindsay Volvo and Mr. Kreps interfered with Mr. Portu's rights under the FMLA by attempting to alter his compensation and his job description, changing his reporting line in an unsuccessful effort to force his resignation, and then by terminating him, in retaliation for his exercise of rights granted under the FMLA, and consistent with Lindsay Volvo's policies.

87.     By attempting to pressure Mr. Portu into signing a new compensation plan and outdated job description containing responsibilities that were not part of Mr. Portu's job prior to taking FMLA leave, and then terminating Mr. Portu in violation of federal law, Lindsay Volvo and Mr. Kreps evinced malice, spite, and ill will; their actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Portu.

88.     Lindsay Volvo and Mr. Kreps engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Portu, within the meaning of 29 U.S.C. § 2617.

89.     As a direct and proximate result of the Defendants' actions, Mr. Portu has suffered and continues to suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, stomach pains, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

90.     Due to the severity of Defendants' conduct, Mr. Portu is entitled to liquidated damages.

## COUNT TWO - RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
### (against all Defendants)

91.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

92.     Lindsay Volvo and Mr. Kreps retaliated against Mr. Portu for taking leave under the FMLA by attempting to pressure him to sign a revised compensation plan and a job description from 2012 which he had never seen before (and which was not his job description prior to taking FMLA leave), changing his reporting line in an unsuccessful effort force his resignation, and then, when Mr. Portu objected to the reduced compensation and new job description, attempted to force him to sign another compensation plan (without reduced compensation), but still coupled with a new, outdated, and different job description.

18

93.     When Mr. Portu refused to sign the documents, and even after he explained that his refusal to sign was based on his legally protected right to return to the same job he had at the time he left on FMLA leave, Mr. Kreps said that he "didn't care" and terminated Mr. Portu's employment.

94.     Mr. Portu was terminated the day after he returned to work, without having received any write-ups (much less, the three required write-ups required prior to termination), which was Lindsay Volvo's normal practice and procedure, and without ever having been counseled or otherwise reprimanded about any alleged performance deficiencies.

95.     The only time Mr. Portu received verbal notice of anything having to do with performance was when Mr. Kreps falsely stated, while Mr. Portu was on leave, that the department was underperforming.  This allegation was demonstrably and objectively false, and Mr. Kreps was unable to provide any details to substantiate this false statement.

96.     Defendants knew, or should have known, that Mr. Portu kept fully abreast of his job duties while on medical leave as he was asked on at least two occasions while he was on FMLA leave to perform tasks for Lindsay Volvo, one of which required his physical presence in the workplace.  In addition, Mr. Portu kept Lindsay Volvo apprised of his intent to return to work as soon as his eight week FMLA leave was up, which he did.

97.     Defendants terminated Mr. Portu because he exercised his right to take medical leave consistent with Lindsay Volvo's policies, and consistent with the FMLA.

98.     Mr. Portu provided his Return to Work letter to Mr. Kreps on February 28, 2019, three days prior to his anticipated return to work, but Mr. Kreps deemed the letter insufficient and did not provide it to HR.

99.     Lindsay Volvo and Mr. Kreps retaliated against Mr. Portu for exercising his right to take leave under the FMLA and consistent with Lindsay Volvo's policies by attempting to alter his compensation and his job description, changing his supervisor to one Mr. Kreps was aware that Mr. Portu did not have a good working relationship with, and then, when that did not cause Mr. Portu to resign, by terminating him, in retaliation for his exercise of rights granted under the FMLA, and consistent with Lindsay Volvo's policies.

100.    By attempting to pressure Mr. Portu into signing a new compensation plan and outdated job description containing responsibilities that were not part of Mr. Portu's job prior to taking FMLA leave, intentionally changing his reporting line, and then terminating Mr. Portu in violation of federal law, Lindsay Volvo and Mr. Kreps evinced malice, spite, and ill will; their actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Portu.

101.    Lindsay Volvo and Mr. Kreps engaged in these practices with malice and with reckless indifference to the federally protected rights of Mr. Portu, within the meaning of 29 U.S.C. § 2617, for which Mr. Portu is entitled equitable relief, including employment and reinstatement.

102.    As a direct and proximate result of the Defendants' actions, Mr. Portu has suffered and continues to suffer severe emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, stomach pains, depression, anxiety, fearfulness, difficulty sleeping, loss of enjoyment of life, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

103.    Due to the severity of the conduct, Mr. Portu is entitled to liquidated damages.

## PRAYER FOR RELIEF

WHEREFORE, PAUL A. PORTU requests that this Court enter judgment in his favor against Defendants LINDSAY VIRGINIA MOTORS, LLC d/b/a LINDSAY VOLVO OF ALEXANDRIA and LINDSAY VOLVO CARS OF ALEXANDRIA; LINDSAY MANAGEMENT COMPANY, LLC; LINDSAY MOTOR CAR CO. d/b/a LINDSAY AUTOMOTIVE GROUP; and DANNY KREPS, jointly and severally, and further:

a)  Award Plaintiff compensatory damages, plus demonstrated past and future pecuniary damages on each of the above-stated Counts; and in addition

b)  Award Plaintiff liquidated damages on Counts One and Two; and in addition

c)  Award Plaintiff his costs, including but not limited to reasonable attorneys' fees and any expert witness fees, and in addition

d)  Award Plaintiff such other and further relief as may be appropriate.

## JURY DEMAND

**PLAINTIFF PAUL A. PORTU DEMANDS A TRIAL BY JURY.**

June 25, 2020                               Respectfully submitted,

*/S/ CARLA D. BROWN*
_____
Carla D. Brown, VSB 44803
CHARLSON BREDEHOFT
  COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
cbrown@cbcblaw.com
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Paul A. Portu*